12-27-58, Del Bolo v. Beamer v. City of Chicago Good morning, Your Honor. I'm Arthur Ehrlich on behalf of the Plaintiff Appellant, Mr. Fagbemi. Your Honor, Jeffrey Waldhoff on behalf of the City of Chicago Defendants. And how much time do you expect to take? Hopefully I can get it done within the court order of 20 minutes, Judge. Do you want any time for rebuttal? Yes. A few minutes? Yes. Your Honor, I believe 15 minutes will suffice for the city. Okay. Thank you very much. Thank you. May it please the Court, Counsel. Before I get into the argument, I guess I could simply ask if you have any questions. I'm pretty sure I won't get through everything anyway. We'll have some for you, Mr. Ehrlich. Okay. Thank you, Judge. The record clearly shows that the events that led to the incident on December 17th, with the entire tank of chemical alum emptying into Basin 3 and the failure to initially discover that, only could have occurred based on a series of very unusual events, all occurring at the very same time, and none of this would have occurred but for this unfortunate incident and sequence of events. Two separate valves were opened that should not have been left open, which allowed the alum to empty into Basin 3. Three separate inspections, which were specifically ordered by the operating engineers, who had all been trained to do the right thing and take note of these things. They were specifically told to check all chemical tank levels. Reports came back each time. Everything was fine. This was unprecedented in terms of the operating engineers not discovering things that they should have discovered on that date. There are low-level tank alarms attached to every single tank, including tank 135. Are there any disputed facts? I mean, it seems to me the facts are pretty clear here and no one is disputing what the record provides as far as what occurred. Is there anything that you... I think that there are some... It's where you interpret the facts rather than what the facts are. I mean, you're just stating what's in the record. I am, but I'm highlighting these particular facts for a couple of reasons. There were findings that were made, which seemed to be against what I believe, as you said, were uncontested facts. So that's one of the reasons I'm going through this. So rather than go through it, what are those specific facts that you think were erroneous? Well, he was faulted, in general, for not discovering that the alum tank emptied and caused the whole problem. As I've gone through these set of facts, he went through every single step and more to make sure and discover what the problem was. All of that ruled out alum as a problem. But as it turned out, if I'm remembering the record correctly, Mr. Fabgani's superiors ordered a test that revealed the problem right away. Not right away, but yes. The alum test was ordered, I believe, by Mr. Stark. That test was not something ordinarily done by any water treatment plant. It was ordered without any notice or notification to Mr. Fabgani. He never was told that test was ordered. Never was told what the results were. He was faulted by the hearing officer and then adopted by the board. He shouldn't have left the plant without checking the alum test result. Why did you do that? He never knew a test was even ordered in the first place. He left the plant for an approximately 90-minute commute to his home, right? Ballpark, yes. He left the plant at a time when the problem appeared to be going in the right direction but hadn't been resolved, right? Obviously, I can't dispute that because we know what occurred after. But if you look at the timing. According to the facts in the record, the levels were going down. It appeared that what they were doing, the backwashing, was resolving the problem, but it was not resolved. There wasn't an all clear at the time your client left the plant. There were two problems in terms of the water levels. One was the pH. That was at exactly normal range at the time he left, even before he left. Turbidity was not where it should have been. But the turbidity was up here. It was coming down all the way. It had a long way to go, but it wasn't a situation where it's coming down, leveling off, make a little bump up. It's coming down. So wouldn't it have been reasonable for the city to expect your client, being the person responsible for the operation of this plant, to call after he left his 90-minute commute, his 30-minute yard work, to call and say, are we okay here? And he didn't. I'm sure in hindsight, Mr. Fagdani has kicked himself for not doing that. But the plant is so huge, there are so many issues going on all the time, even when everything is running okay. Yeah, but this, you said, was unique. Yes. But the point I'm getting to is that all prior situations, and there have been emergencies in the past, various problems of one sort or another, every single time the staff has been trained and has called him wherever he may be of any problem. He relied on that practice. There's only so much he can do. I mean, he can sit in his office and watch, yes, and that would have been, I guess, the politically correct thing to do, for lack of a better term. But there was nothing more he could have done at that point other than watch and say, great job, guys. I'm guessing, Mr. Ehrlich, that had Mr. Fagdani stayed there, he'd have his job today. I think that the city would have had a bigger problem in trying to convince everybody else to terminate him. I don't know that would have been the case. Part of the arguments we've made here are retaliation for a prior lawsuit. I think that while we didn't spend a lot of time on that issue, the penalty that was imposed and then increased the termination, the charges that he was charged with, even though the facts didn't show many of these charges, for example, not checking the water tanks. There were four separate charges where Spatz, the commissioner, said, you failed to check the tanks, so that's one of the reasons why we're trying to fire you. Spatz admitted at the hearing, geez, I don't really know if he did or didn't, but I still went off and signed off on the charges. Some of these things don't make sense unless you consider the possibility of retaliation. So while I don't think they would have had enough ammunition to convince this court, trial court judge, maybe even the personnel board to get rid of him, the attempt would have still been made. What we're really talking about, it seems to me, is you can see that maybe he should have been demoted, right? We would be willing to accept that, yes. So it really seems to me what we're talking about, whether going to the termination was arbitrary or unreasonable. Yes. Why don't you address why your specific arguments as to that? Because to me, that really gets into what we need to decide. And that seems to me really what you're talking about here. I mean, I don't want to concede. I'm not saying concede anything. I understand that. That demotion was appropriate, but we're not challenging that. It's much more important, in fact, to me at this point, that he has his job. I'm trying to find the points that go directly to that issue, Judge. What we argue is that the hearing officer made a number of findings that simply had no basis in fact, that were not only that there's no evidence to support some of these charges, but testimony of the city's own witnesses contradicted. And then there were some of the charges that became charges, which never were charges. One of those, for example, would be the alleged failure that there was no protocol testing procedure in place to check the tank alarms. And I don't know really how the hearing office came up with that. But the evidence was very clear, not just from Mr. Fegbemme, but Mr. Skiadopoulos, which was a witness for the city that we had that system in place. It was always there before we even came to the plant. Yet he was faulted for not establishing that procedure, which already was in existence. That's one example, which then got compounded with the decision to demote and then terminate. Another one was the claim about not checking the alarm test results. Yet the evidence is very clear. No one says otherwise. Mr. Fegbemme was never even told an alarm test was even being performed. There was a situation where we were trying to argue that the penalty was not appropriate because he was the only person disciplined at any level of discipline. No warnings, no reprimands, no suspensions. Nobody else got anything. The city's counter to that at the hearing was to say to Mr. Fegbemme, well, you know, you're the boss there. How come you didn't go discipline someone who you thought maybe was at fault here? That somehow got changed to one of the findings against Mr. Fegbemme as being that he failed to do his own investigation to see who else may have been responsible, and that suddenly became an argument in charge against him. With regard to the results of the alarm test, did he talk to anybody before he left? I mean, did he say to Julian or Stark or Commissioner Spatz or Mr. Scottadopoulos, I'm leaving? No, he did not. Wouldn't that have also have possibly alleviated the situation? Yes, that is a factor that was cited. Correct. I mean, we're looking at hindsight, and, yes, there are things he could have, should have done better perhaps, and that's why we never tried to challenge the demotion issue as a penalty. But to then jump to the next step under all the facts going on, that leads to termination. That's where we have a huge disagreement. The plant is just enormous, and most of the trained people Second biggest plant in the country? Yes, or the world, actually, I think. There are things that go on and get fixed without any notice to not only just Mr. Fegbemme, but some of the people who are immediately below him, because there's just so many things going on. They, the staff, always know to call him, mostly on the cell phone, because he can be anywhere at all, be it in the plant, inside the plant, wherever. So for him to say, hey, I'm leaving, really wouldn't have had much of a bearing, because they know to contact him. If he's in his office or he's out in one of the areas in the plant or he's out at lunch or he's home, they don't go say, where's Fegbemme? They call him on the cell phone. But this is a situation that's unique, that could be hazardous to public health, and he leaves a half hour after his regular time to leave, I guess. Forty-five minutes, but yes. Forty-five minutes. In this situation, I mean, we have to look at what was going on that day. This is different than any other day, and maybe on other days he doesn't say anything, but on this day, not to say something, isn't that meaningful? Would he wish he had done that differently? Yes. But given all the signs at the time, things were under control. And it wasn't just Mr. Fegbemme that left, or left without telling people he was leaving. The situation was enough in control at that point that both Seebeck and Stark were specifically sent there to see what's going on and see how they could help and what they could do. They left too. So it wasn't just Mr. Fegbemme who had this false sense of security, who just abandoned ship. But everybody was on the same page. Everybody believed the problem was pretty much resolved at that point in time. Enough so that Seebeck and Stark, they felt confident enough to leave as well. I think the final point I'll make here is that it was clear that there was no single event or incident or charge, based on the own reasoning of the hearing officer and the board, that led to the termination decision, or the hearing officer to the demotion decision. It was the totality of events. And I cited a number of cases which looked at the totality of events. And when you look at the totality, you have to look at the totality. Instead of that being done here, it seemed to be more of a situation was, well, you violated this rule, you didn't do this act, so boom, we're fined against you and we're firing you. Example being the alum test. Yes, he didn't check to see if the alum test results were what they were, but that ignores the fact that he never knew that was even being performed in the first place, as one example. There is no reference in the record to it states that Mr. Fegbemme had a 22-plus year career there. There's absolutely no reference at all in the hearing officer decision or the personnel board decision beyond that, that his record was beyond exemplary. He had risen up the ranks very, very fast. He was double promoted several times. He provided a response to the charges, which is part of the record, that went through everything he had done over the years, including situations where there was a chlorine leak or he put on his own hazmat suit to go and address a situation, situations where there was a fire to a generator and it was going to be destroyed to put out the fire, but he had a different solution to try and correct the fire, stop the fire, so it didn't have to be entirely replaced. There were many things he had done. Every single evaluation he had was stellar. Not one single blemish at all in his entire 20-plus year career. None of that was considered. Rather it was like, oh, he's been a long-time employee, so okay, we'll think about that, although that was not even really considered either. You have to look at the totality. You can't look at one individual thing. Yeah, he left the plant, yes. Should he have left the plant? Second guessing, no, perhaps he should not have. But you've got to look at what was going on at the time with all the levels of the chlorine, I'm sorry, the pH being 100% normal and the turbidity coming way, way down. The clear wells were agreed to by everybody else as being the most important thing to be looking out for. If problems are going to be in the basin, that's going to happen. They just want to make sure that the clear wells were clear. When he left, every one of the clear wells was 100% fine, no problems whatsoever. So, yeah, should he have stayed longer? Perhaps, yes. But under the situation, I don't think you can agree that a termination, even a demotion, but termination is what we're talking about, was appropriate in that scenario. Are there other specific questions? No, thank you. May it please the court, counsel. Again, I'm Jeff Walloff on behalf of the city. Did the board look at the totality of the circumstances? They did, Your Honor. It's explicit in the decision that they considered all the factors, including, I might add, they specifically noted they looked at evidence and mitigation and considered progressive discipline, including perhaps demotion, and decided reasonably that on these facts, termination was an appropriate remedy. And, Your Honor, notwithstanding Mr. Fagbemi's past history of some good service to the city, there are first offenses where termination is an appropriate remedy. This was one of those cases. And what factors in the record do you say support that the ultimate sanction of termination would be appropriate in this situation? The individual responses of Mr. Fagbemi and the responses of his employees that he was responsible for as the individual in charge of the total operation of the plant, and, I might add, under the incident response model adopted by the Department of Water Management, he was the commanding incident responder. He had unique responsibilities, and, therefore, it's appropriate to hold him to unique accountabilities in his response to this particular incident. And, as you pointed out, Your Honor, really the facts of this aren't really in dispute. We know what was done for the most part. We know what was not done for the most part. So I'd like to focus on really what those facts show about Mr. Fagbemi's leadership, judgment, communication, inability to follow through, unwillingness to pay close attention to what's going on in his plant, inability or unwillingness to take into account additional information as the circumstances changed. And all of those factors are really what reveal that Mr. Fagbemi was not in a position where he could be trusted with a position in the Department of Water Management, which has as its core mission providing clean water to over 5 million people across the Chicago area and the hospitals, schools, and neighborhoods that they live in. He couldn't be trusted with any position. He had to be terminated. That's right, Your Honor. And it was a reasonable conclusion on this. The specific facts, and I might just highlight a couple of them, that show just how the nature of these problems that he had. His failure to complete the tank checks to see if there had been an unexpected drop, that's pretty well established, despite the ready availability of the SCADA system and the drop sheets that were available right there that could have helped him. His rush to judgment in disregarding a chemical cause and adopting a slug theory. And that slug, Your Honor, continued to be his theory. It continued to be the remedy that he pursued. That backwash was supposed to be a remedy to that slug problem. Even though the pH remained low and the turbidity remained high, not for a few minutes, not for a few seconds, but for hours. Testimony in this case shows that past slugs at the plant had occasionally led to a drop in water quality or a drop in pH that lasted a short time. Mr. Fagbending had been taking into account that additional information as time went on, continuing to see, although improving pH and reductions in turbidity, they were still way too high of a turbidity and too low of a pH for a slug to really be a likely culprit. His unwillingness to take that additional information into account over time shows errors in judgment. Inability to take these things into account is a rigidity that prevented him from being able to pursue new remedies or look for potential other causes. He went to his office, worked on paperwork, checked in a couple of times what the hourly rates were, excuse me, the hourly turbidity levels were, and at 4.45, 15 minutes before another reading was about to come up, he decides to depart the plant without checking in with anyone, goes home. The record seems to say that even though he had been at the plant from 4 to 4.45, he didn't speak with anyone after he made that initial 4 o'clock check-in. So it's not just the departure at 4.45 that led to two more hours of being incommunicado. There was the 45 minutes after his initial check from 4 to 4.45. There was a long window of time where he was not aware of what was going on at his own plant. The inability to order an Allen, or excuse me, his failure to order an Allen test or to become aware that an Allen test was being run shows that he was not out front, not leading, not asking questions, not finding out information about what was going on at this plant. So all that shows maybe he shouldn't be in charge. But we're not talking about that. We're talking about his termination. Yes, sir. Your Honor, what did the board, I mean, obviously the hearing officer thought that should be demoted. I'm sorry. Your definition was demotion. And the board said termination. That's correct, Your Honor, because they thought that the total, if you look at all the circumstances that are here, that what you're looking at is someone that doesn't have the demonstrated abilities to make these types of judgments, make these types of decisions, to make decisions, to get information to the people it needs to be gotten to, to pay attention to what's going on, take into account changes in evidence as it occurs over time. And, Your Honor, those types of qualities would be present whether he were in charge of the plant  as long as he has some sort of task involved with the production of clean water to employees, excuse me, to citizens of Chicago. Loss of faith in his abilities to operate at any kind of supervisory capacity. And not just, yes, Your Honor, a supervisory capacity or even in those positions that help inform supervisory capacities. At an intermediate level, and we can see what some of the duties were of some of these intermediate employees were, Mr. Skiadopoulos and others, you can take a look at what they were called upon to do in this record, obtaining information, transmitting information. Some of the errors in judgment demonstrated by Mr. Fagnemi, his decision to eschew certain types of information, not exhaust all the potential avenues of investigation to determine whether there was a chemical cause, when, in fact, a chemical cause was a very likely culprit right from the beginning. That's the reason they checked the tank levels to begin with. That's why they checked the tank flow calculations to begin with, because there was a suspicion there were three potential chemicals that could have really caused these problems at the plant. Chlorine, fluoride, aluminum sulfate. Those were the initial suspects. He was too quick to rule those out. And even when Mr. Stark came to the plant and said, couldn't it be alum? No, no, it couldn't possibly be alum. It could only be a slug. It's the only possible result, even though he hadn't checked these other readily accessible and available avenues. That type of investigatory judgment would inform his decision at filtration engineer or any other position in the plant. What about Mr. Ehrlich's point that nobody else in connection with this extremely hazardous situation was disciplined? Nobody else was disciplined. Nobody else had the total operations of the plant laid at their feet. Nobody else involved in this case was the lead incident responder and had those types of unique responsibilities that Mr. Fagbemi had. He was in a position- What about the mid-level person who ordered the alum test and didn't tell his supervisor about it? Mr. Skidopolis followed through on an instruction from- The record's unclear how Mr. Skidopolis was asked to order that alum test. Mr. Skidopolis, the record shows, believed- His recollection was that it was Mr. Stark that had asked for that information. And he, in fact, did transmit that information to Mr. Stark eventually. Although Mr. Stark, when asked, said he wasn't the one that had ordered it. So the record's a little murky as to who initiated that. But Mr. Skidopolis followed through on completing that test, or had he and his water chemist staff complete that. And they did transmit that information. Mr. Fagbemi's unawareness of that test and of the results of that test are really the result of the fact that he chose to, at about 3 o'clock after this- between 2 and 3 o'clock after the brain- Mr. Stark, Mr. Skidopolis, Mr. Fagbemi are meeting in the chemical lab and talking about what the potential causes are. And Mr. Fagbemi announces to everyone, It's a slug, I know it's a slug, the backwashing has already begun. He goes back to his office after that 3 o'clock and doesn't communicate with Mr. Skidopolis after that. If he had been taking the level of accountability that's required for an employee, he would have been engaged in the processes that are going on at the plant, would have been aware of it, would have been asking questions, would have been looking for information. Mr. Stark and Mr. Seebeck, by the way, who are criticized by plaintiffs for departing the plant as well, it's apparent the record shows they went back to Jardine with a water sample from Basin 3 to try to run additional chemical analytics on it there because they believe the water chemistry lab at Jardine was more sophisticated than that at the South Water Purification Plant. They continue to look for information, continue to look for potential causes. Mr. Skidopolis did that. So it just underlines the individual that turned off that analytic part of the process was Mr. Fegmeme. He's uniquely, he was in a unique position of trust here and was held accountable appropriately. Going back to one of the final points of Mr. Ehrlich, here you have an individual who received glowing reports, who in situations that required immediate attention in the past, came to the fore, apparently handled very well because there's nothing previously to show that this individual has anything but a stellar record. Yet one, even admitting, he may have failed here, let's assume that, everything you say, is that enough? How much weight, if any, should a board place on somebody's previous record? And when you're talking about demotion versus termination? The board clearly did give some consideration to his past record of service to the department. It's in the record. They note that they considered it. The amount of weight they should be giving to it is in the discretion of the board. They did not give it enormous weight, at least in light of the other evidence of the substantial shortcomings of Mr. Fegmeme. And I think in a case like this, where the stakes are so potentially catastrophic, where you're talking about this water isn't just a little bit bad, we're talking about water that's somewhere between 100 times and 1,000 times more acidic than it should have been at that part of the plant. Water that should have had a 0.6 or 0.8 turbidity NTU reading, it's at 40. It's at 28, then it's at 60, and it's at 40 when he leaves the plant. And he's incommunicado for a couple of hours. These are not minor, secondary failures. These are substantial shortcomings. The kinds of substantial shortcomings that the law provides are grounds for not just discipline but termination. And I think the board appropriately balanced those issues out. Given the high potential consequence of this conduct, the sins of omission and commission, the departure without clear communication to anyone, and ignoring mounting evidence that would have maybe led to him making a different set of decisions, in this case, termination was an appropriate remedy. And when you are on appellate review or any reviewing court that looks at this, including below, Your Honor, the circuit court level, when they had some additional questions, they got some additional responses from the hearing board, and they identified a number of grounds. And the circuit court said, yes, those are within the sound discretion of the hearing board. Your Honor, we ask this court enter judgment affirming the decision of the board. Thank you very much. Mr. Ehrlich. Although counsel indicates a belief that the board fully considered his exemplary record, I see nothing in the decision by the hearing officer or the board that says that. It does make a reference to his 20-plus years of service. It says conclusively we considered everything, but it doesn't say that is what they looked at at any point in time. It doesn't say, yeah, he had a great record, but we're still firing him. Just, yeah, we looked at everything without saying what the everything was. We're going to fire him. But there's no in administrative review cases. I mean, we operate from a presumption that the board, the decision-making body, considered all appropriate evidence. And when the board says we considered his record of service to the city, is there any basis in the law for us to go behind that and say, well, they didn't really consider it? Well, if they looked at and said they looked at his great record, no, we can't question that. Judge Flynn struggled with the case and remanded the case to make sure that the board clearly indicated why demotion is not going to work here and why only termination has to be done. Their supplemental decision, so it's a second bite at the apple, doesn't say, yeah, we did consider the great performance. No, it just repeats the same stuff as before, makes the same conclusion. So they did have a second chance. They should have known that maybe the record was a little bit sparse on why demotion was not appropriate or maybe we should look at other things before we say we want termination. They didn't do that. I don't think we have to second guess here and read their minds as to what they didn't do. They had the chance to go through and indicate, yeah, we looked at that, but they didn't. Their own record, their own rationale indicates they did not. The SCADA system, which counsel refers to, and it's noteworthy that they didn't challenge any of the clear evidence and clearly uncontradicted evidence, was simply not effective. It was unreliable. It malfunctioned many, many times. But it was the fact that it may have been unreliable doesn't mean it was not functioning that day, right? Correct. He didn't look at it. In an emergency, SCADAPOLIS and FEDME say we don't trust that. And especially in an emergency, I'm sending my trained operating engineers to look at that thing, look inside that thing, and see with their own eyes, not looking at some board. That was, should have been, and why it wasn't in this situation, the best way to get it done. You don't trust something in an emergency especially that's not reliable. The people who were hired to maintain the system told FEDME, you've got to rehaul this thing. It's just too old. It's not working. It needs to be replaced. Why they can fault FEDME for not relying on SCADA in that situation is beyond me. And it's not just FEDME. SCADAPOLIS is very clear of the same points. There's an argument that the drop sheets show that the Allen tank 135 had dropped and that FEDME should have gone to check that. Number one, Spatz himself acknowledged that the control room engineer had that information, should have brought that up the chain of command. That's number one. Number two, that entry in terms of when it was entered, and this is City Exhibit 5, shows that at 1600, which is 4 o'clock, that is when the level was shown to be .12. So that wasn't in the record. So even if FEDME at 3 o'clock had gone over to look at the document itself, he wouldn't have seen what the level was on that drop sheet. So that's two points which are a little bit overlooked here. One of the reasons why I was going through the facts initially was to make it very, very clear why chemical cause was ruled out, why it had to be a slug theory. The argument is made that while slugs in the past occurred, but these are really tiny slugs and only a very, very short period of time, would the census get followed up? It depends on the size of the slug. A tiny slug, short time. In this situation, given the drops in the pH and the huge rise in turbidity, they weren't thinking some tiny little slug. They were thinking a big slug. That's going to take time to go through the system. And as it went through the system, indeed, the levels dropped. So there's nothing to show why that was unreasonable. The argument is made that when Mr. Stark told FEDME, hey, what about alum, that Stark said, what are you, crazy? No way. No. This was a brainstorming session with the assistant chief of water purification with the, I forget their levels, but they're way above. These people are very well trained, educated, and smart. Stark had a master's in environmental science, been with the water district for over 20 years, doing water purification issues for 10-plus years. They weren't going to simply accept what Fleck-Bendy said. Fleck-Bendy went through in detail why he ruled out the chemical cause being alum. Mentioned the three inspections. Everything came back normal. Mentioned no tank alarms. No problem there. Checked flocculators. Checked a whole bunch of things, every which thing ruled out chemical cause. And that's what he explained to Stark and Seebeck at that time. And no one said at that point, you know, we really don't think that's correct. We think you should do X, Y, and Z, or how about X, Y, and Z. They accepted it. They expressed no doubt of any kind at that point in time. All that information went to SPACs, including the backwashing. SPACs didn't say, time out, come on, let's go back and look at these things. Okay. No problems expressed. So to suddenly say after the fact that was wrong, when no one else challenged that, when Sciadopoulos, who was the city's own witness, said, yeah, under the facts, we ruled out chemicals, including alum. Had to be a slug. Nothing else made sense. When Mr. Fagbeni's counterpart at the Jack Dean water plant, in a hypothetical situation where all the facts that we had were given to him, there's nothing else that could have been. Chemicals ruled out at that point. Has to be a slug. Nobody at the time in question challenged the slug theory. Not at all. Unless there's any other questions. Thank you very much. We'll take the case under advisement. Appreciate the council's arguments. And I thought your briefs were well done, both of you. Thank you.